**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Robert Bradford MURPHY, a/k/a Samuel George Matz, and Elizabeth Irene Murphy, a/k/a Elizabeth Irene Matz, Defendants and Appellants.**

Nos. 16895–16896.

United States Court of Appeals
Sixth Circuit.

June 12, 1969.

As Amended Sept. 12, 1969.

Certiorari Denied Oct. 27, 1969.

Thomas S. Shore, Jr., Cincinnati, Ohio, for appellant Robert B. Murphy; Taft, Stettinius & Hollister, Cincinnati, Ohio, on brief.

Robert Bradford Murphy, Elizabeth Irene Murphy, pro se.

George G. Newman, Asst. U. S. Atty., Detroit, Mich., for appellee; Robert J. Grace, U. S. Atty., Detroit, Mich., on brief.

Before WEICK, Chief Judge, O'SULLIVAN, Circuit Judge, and McALLISTER, Senior Circuit Judge.

McALLISTER, Senior Circuit Judge.

Robert Bradford Murphy and his wife, Elizabeth Irene Murphy, were arrested in Detroit and indicted on two counts for (1) transporting from Cincinnati to Detroit stolen documents of a value in excess of $5,000, belonging to the National Archives, knowing the documents had been stolen in violation of Title 18, U.S.C.A., Section 2314; and (2) possessing stolen documents of the United States, of a value in excess of $100, with intent to convert them to their use and gain, knowing such documents had been stolen in violation of Title 18 U.S.C.A., Section 641.

On the trial, the District Court dismissed the first count on the ground that transportation between Cincinnati and Detroit was not proved. The jury found the Murphys guilty on the second count of the indictment. They were each sentenced to a period of ten years, the institutions to be selected by the Attorney General. Robert Bradford Murphy was also sentenced to an additional period of six months for contempt, arising out of his conduct during the trial, the contempt sentence to run concurrently with the ten-year sentence.

Appellant Robert Bradford Murphy filed a motion to appeal in forma pauperis and for appointment, by the Court, of counsel; and he was permitted by this Court to appeal in such capacity. In a motion for appointment of counsel, his wife did not make the necessary showing of indigency, and such motion was denied. However, a brief was filed on this appeal by both Robert Bradford Murphy and Elizabeth Irene Murphy, and this Court has considered such brief as representing the contentions of both parties on appeal and has considered the rights of both parties as appellants in its determination. On the same day on which both of the appellants filed a brief, acting in propria persona, another brief was filed by court-appointed counsel for Robert Bradford Murphy; and this brief also has been considered by the Court in determining the appeals of both appellants. The contentions of appellants on appeal may be said to be embodied in three claims: (1) That they were denied their constitutional right to a fair trial by the conduct of the District Judge; (2) That they were denied their constitutional right by the refusal of the trial judge to permit the subpoenaing of certain defense witnesses and to permit access to evidence seized from appellants and withheld by the Government; and (3) That they were denied the effective assistance of legal counsel prior to, and during their trial. Other claims of error are without merit and do not warrant consideration.

The background of the case merits some discussion and from the record the following appears: In January 1964, the FBI office in Detroit had in hand fugitive warrants which were issued in Florida in June 1962 for the arrest of Robert Bradford Murphy and Elizabeth Irene Murphy.

On January 2, 1964, FBI Agent Croon, having had information that a woman answering Mrs. Murphy's description was selling documents to the Detroit Public Library, was making observations of persons at the library and, about noon of that day, saw a man who, he did not realize at the time, was Robert Bradford Murphy. Agent Croon stated he had only an obscure photograph of Murphy and that when he saw him, Murphy had a large mustache which apparently did not show in the photograph. However, later that same evening, at about 6:30, Croon and another FBI agent, Gerald W. Murphy, saw Murphy again outside a

Kroger Company store but they were still unsure of his identity, although, apparently they suspected that he was the man they were looking for. It seems that they must have been relying, to a certain extent, on the dim photograph of appellant which they had, picturing him as "WANTED." Appellant, however, entered the grocery store, made some food purchases and then left. At that time he was put under surveillance by the two agents. Appellant headed south in an alley running parallel with the street on which the store was located. The agents also walked south in the alley and, at a certain point when appellant stopped, the agents casually engaged him in conversation, in the course of which they told him of their interest in historical documents.

Whatever may seem abrupt about the inquiry of the agents does not concern us, nor does the plausibility of their mention of the matter of such documents, as the testimony was unquestioned on that score. One would think that appellant would likely have been suspicious of the two agents but, apparently, he was not; and the detailed circumstances of their meeting and conversation were not recounted, nor impugned by the evidence of the appellant on the trial.

In any event, in reply to their expressed interest, appellant then told the agents that his wife was in the business of buying and selling historical documents, and offered to take them to his furnished apartment a short distance away. After appellant and Agents Croon and Murphy entered the apartment, Agent Croon saw Mrs. Murphy and immediately realized that she was the woman for whom they also had a warrant for arrest.

In a conversation that followed, Mrs. Murphy advised them that she had documents to sell, but that they were not immediately available to her, and that she would have to pick them up the next day in Canada, where she was going to secure ten cartons of historical documents.

While the agents were in the apartment they observed five children there. They arranged an appointment with the Murphys for the next day and, because of the children, left the apartment and used a nearby phone to make a call to the FBI office for aid in this matter. When Agent Croon returned from making the phone call, he saw appellant outside the apartment building with Agent Murphy, who stated that appellant had left the apartment but that he had stopped him and told him that he was a Special Agent of the FBI.

Appellant and the two agents then entered the apartment where they placed the two Murphys under arrest, telling them of the charges on which they were being arrested.

At the time of their arrest, the Murphys would not give their names to the agents. Afterward, other agents arrived from the FBI to make arrangements for the five children. Appellant Murphy was searched and in his wallet were found two Abraham Lincoln letters and a letter from James Monroe. There were also in his wallet two receipts indicating a shipment of ten cartons of goods to Chicago earlier on the same day, January 2, 1964. Six of the cartons, according to one of the receipts, were shipped to the Greyhound Bus Station in Chicago to be placed in the "Will Call" department where they were to be picked up later; four of the cartons went by Continental Trailway but to be put in the "Will Call" department. The receipts were not made out to the Murphys; one was addressed to "J. McBride," and the other, to "Laughton." On the trial, however, Mrs. Murphy testified without contradiction that the cartons were shipped to Chicago by the Murphys.

At the time of the arrest, appellant Murphy claimed to have a heart condition and told his wife he wanted some medicine, instructing her to get it for him. She went to the rear stairwell where there were six suitcases and a portable typewriter which, she stated, were owned by her and her husband. Mrs. Murphy then pointed to a briefcase and said the medicine was inside. Inasmuch as the agents had reason to be-

lieve the Murphys may have had a weapon on the premises, Agent Murphy opened the briefcase and pointed to the medicine which appellant's wife said was that for which she was looking. At the same time, the agent observed some historical documents in the briefcase.

From the suitcases were secured, among many other documents, 210 historical documents that were claimed, and found by the jury, to have been stolen from the National Archives in Washington, D. C. Although these documents were not separately catalogued, they were identified, as hereafter appears, as documents which had been in the National Archives in late August and early September 1962, during the same period of time in which appellant and his wife were spending many days in the Archives. Appellant had filled out an admission slip dated in August, stating that he was Robert B. N. Murphy of Thorne Street, Evanston, Illinois, and that he was a journalist for Universal Press in Chicago. He also stated on the admission slip that his purpose in the Archives was "To examine records of the Colonial and Revolutionary War Periods. To form a basis for work I've been commissioned to write on Famous Americans." There was no such publication press as "Universal Press" in Chicago or Evanston, or any "Thorne" Street in Evanston, so appellant's representations in this regard were completely false. Mrs. Murphy was in and out of the Archives during the period that appellant Murphy was there from August 24 to September 14, 1962. All of the 210 documents which were in the National Archives in August and September 1962, while the Murphys were there, were available to appellants during that time. How, then, did it happen that these documents were later found by the FBI in possession of appellant and his defendant wife?

While appellant was calling for different historical documents in the Archives to be examined by him on the ground that he was doing research work for a book to be published, his wife, a co-defendant in the District Court, who also was found guilty by jury, testified that she was living in the Willard Hotel in Washington. During that time, she testified, a man whom she had once seen in Jones Book Store in Washington, but whom she did not know or whose name she did not know, approached her on September 10, 1962, at her hotel and offered for sale to her a large volume of documentary material for $2,000. She testified that she did not examine the material, but merely glanced at it and "did not take the trouble to examine the exact contents of each letter." She further testified: "He stated what he had and what he wanted. I thought it was a good buy, so I purchased it."

At this point in the testimony of appellant's wife, the court inquired:

"The Court: As a matter of curiosity, if you did not look at it, how did you know it was a good buy?

A. I looked at it in the sense—I did not specifically see what each letter contained, but I looked at the material.

The Court: You have already told us that you don't know anything about documents; that you would take the word of a person, or take them somewhere to be authenticated.

A. Yes.

The Court: Did you do that in this case?

A. No, I did not. I took the gentleman at his word.

The Court: All right. Go ahead.

A. And they all were—they looked old, and some were tattered and worn, and I purchased them."

Later, on cross-examination, appellant, who was conducting his own case, asked the witness, his wife, the following:

"Q. This particular package, how many papers would you say it consisted of? Were they counted or anything?

A. I believe I counted the pieces, but the correct number, I would not remember right now.

Q. Where is this material now?

A. In the courtroom."

The material that the witness indicated was in the courtroom was material that had been stolen from the National Archives.

It is to be especially noted that appellant's wife claimed she bought this material on September 10, 1962, from a stranger, whom she had seen only once in a bookstore. However, Mr. Parke Jones, a witness sworn on behalf of appellant, testified that he had seen appellant in his bookshop once before he had seen appellant's wife, who was using the name of Louise Adams which, she admitted on the stand, she often used; that in September she had sold him a letter signed by Andrew Jackson, and on the same day had sold him another Andrew Jackson autographed letter. He testified she had on the same day also sold him a letter written and signed by John Tyler, and that he had purchased a letter from her from Abraham Lincoln with an endorsement on it in Lincoln's handwriting. She also had sold him a letter from James Monroe. Mr. Jones had in court his receipts for payments for all of these letters, showing he had purchased them on September 6 and 11, and October 15, 1962. It therefore appears that Mrs. Murphy was selling, on September 6, 1962, letters which she claimed she had bought from a stranger on September 10, 1962; and, as hereafter appears, appellant Murphy was in the National Archives with these letters available to him out of the search room for several days immediately prior to September 6, 1962. The foregoing testimony and facts seem to dispose effectively of the contention that Mrs. Murphy had purchased these letters on Sepember 10, 1962.

On direct examination, Mr. Jones, who was appellants' witness, testified, in answer to Mr. Murphy's question with regard to a Lincoln letter he had purchased from Mrs. Murphy:

"Q. (By Mr. Murphy) Did you return the Abraham Lincoln (to the Archives)?

A. Yes.

Q. They convinced you it was their property?

A. Yes, they did."

The foregoing was emphasized by the questions of appellant himself. In certain cases, Mr. Jones had sold some of these letters which he had purchased from Mrs. Murphy and had to buy them back in order to return them to the Government. Mrs. Murphy further testified that she was in the Archives every day that her husband was there during August and September 1962.

Dr. Robert H. Bahmer, Deputy Archivist of the United States, examined each of the 210 documents seized by the FBI in the possession of appellant and his wife, and testified from his personal knowledge that each and every one of these documents were in the possession of the National Archives and were the property of the United States as late as August 1962. All of these documents, according to the evidence, had been called for by appellant Robert Murphy and by other researchers and all were out in the open in the central research room of the National Archives during the time appellant Murphy was there in August and September of 1962, the original records of the Archives showing that he was there during 1962 on August 18, 27, 28, 30, and 31, September 4, 6, 7, 10, 11, 12, 13 and 14.

Further identification of the stolen documents results from a remarkable coincidence. Of the 210 documents that were found in the possession of the Murphys, it appears that the first 42 items had been in the possession of the National Archives in the summer of 1962 and had been photographed for Professor Gerald Gunther of Stanford University; and when the National Archives discovered that someone had stolen the original documents, they asked Professor Gunther for copies of the photographs of the items which the Archives had previously photographed for him.

Moreover, of the 210 documents which were found in the possession of the Murphys by the FBI, items numbered 43, 44, 45, 47, 49 and 54 were also further identified, by unusual chance, as belonging to the Archives, after they had been previ-

ously identified by the Deputy Archivist, Dr. Bahmer, as being part of the Archives collection.

The evidence disclosed that about the time Robert Murphy was in the search room of the Archives, Mr. Edwin C. Fishel was also doing research in the Archives as he was planning a book on the "Intelligence of the Civil War." He had studied the items mentioned in the foregoing paragraph and vividly recollected them. He had taken a picture of one of the items for use in his proposed book, and had a Xeroxed copy of another of the items.

We now arrive at the reason why Mr. Fishel happened to be called as a witness in this case. In the National Archives, as we have observed, Mr. Fishel had seen and carefully examined the items above mentioned which were later found in the Murphys' possession. But how did it happen that anyone knew about Mr. Fishel's seeing the items and how did the Government come to call upon him as a witness to that effect after the documents, which had no distinguishing marks, had been stolen, and Fishel had practically finished his work with those documents? The answer arises out of a quirk of chance as hereafter appears.

Howard Wilcox, the owner and operator of the Estate Book Sales of Washington, D. C., testified that appellant Murphy, representing himself as Charles B. Williams, came into his shop on October 8, 1962, offering a number of civil war letters for sale. Mr. Wilcox, although he seldom dealt in documents, asked him: "How much?" and appellant Murphy replied: "A hundred dollars." Mr. Wilcox offered him $75.00 and appellant accepted this amount. Appellant also had four other civil war letters written by "well-known people," and Mr. Wilcox offered him $35.00 for them. Appellant said he didn't think that was enough but came back the next day and accepted $35.00 for the four letters.

Mr. Wilcox at first noticed that the letters were civil war material only, but later, in reading them more carefully, saw that they were concerned with civil war espionage at the time of the Battle of Gettysburg. Now, Mr. Wilcox had a friend who was a collector of civil war documents, Dr. Walter Pforzheimer of Washington, D. C., a member of the corporation of Harvard University, and a university professor, so Mr. Wilcox called, telling him that he thought these letters would be of interest to him; and Dr. Pforzheimer came in the next day and bought all of the documents—110 in number, which Mr. Wilcox had purchased from appellant Murphy. After a little time, Dr. Pforzheimer called Mr. Wilcox and told him he had learned that the papers which he had sold to him were stolen from the National Archives. Appellant Murphy, in his cross-examination, asked Mr. Wilcox the name of the man Dr. Pforzheimer had consulted from whom he received the impression that the letters had been stolen from the National Archives, and Mr. Wilcox replied that Dr. Pforzheimer had consulted Mr. Fishel, who had been doing research in civil war espionage. When Dr. Pforzheimer was sworn as a witness he testified that Mr. Fishel had come to his apartment in reply to his request in order to examine the documents he had purchased from Mr. Wilcox and, after studying them, Mr. Fishel said: "Walter, these are wonderful documents, magnificent, but there is one thing wrong with them— they have all been stolen from the National Archives." Later, Mr. Fishel, as a witness identified all of the material which Dr. Pforzheimer had purchased from Mr. Wilcox as having come from the National Archives. He had been working on this same material during the time that appellant Robert Murphy was also in the National Archives, and had made copious notes with regard to all of the matters contained in these stolen documents, a fact that appellant could not have known.

Much other evidence of sales of letters from the Archives by the Murphys was introduced. Moreover, it appeared that the ten cartons of material which had been shipped from Detroit to Chicago by the Murphys on January 2, 1964, the day

before they were arrested, contained rare books stolen from the Detroit Public Library, and the Wayne State University Library, as well as pictures, engravings, and the like, cut from other rare books in these libraries. This evidence was introduced under the rule of similar acts to show intent, and, under the same rule, evidence was introduced to show that historical documents were stolen from the Indiana State Library, and the Georgia Archives. Appellant Murphy and his wife, or appellant Murphy alone, were in these various libraries and archives examining the material under a variety of pretexts, using numerous aliases, giving false addresses, and pretending that appellant Murphy was engaged in some kind of scholarly work. Wherever historical documents or books were stolen from the National Archives and the libraries, or other depositories of such papers or books, there was the very strange circumstance that the Murphys had been there shortly before the thefts were discovered and the property was afterward found in their possession or proved to have been sold by one or other of them.

Another most suspicious circumstance is that when the National Archives had already photofilmed a document so that the original was not permitted to be handled by a researcher, appellant Robert Murphy was completely uninterested in such a photofilm, and was interested in handling only original documents.

Appellant Murphy made much of his contention that the documents were not genuine and could not be proved as coming from the National Archives; Mrs. Murphy based her testimony upon the claim that the documents she sold and those that were found in her possession and that of appellant, were sold to her by a stranger in Washington, and that although she did not know this man and was unacquainted with historical documents, she bought them at a price of $2,000, after just glancing through them.

Mrs. Murphy testified that she married appellant in 1955 in Mexico and when asked "where in Mexico," merely replied: "Mexico." She admitted that she may have used the name "Wilson" at that time. She then testified that she had used a number of names taken from the names of owners of antique shops she had purchased. She stated that she "may have used" the name of "Elizabeth Kane" in Akron in 1957; that she may have used the name of "Helen Martin;" that her husband may have used the name of "Wayne Martin" in Springfield, Ohio, in 1958, and that she may have used the name of "Rachel Armstrong" in Baltimore in 1958. Further, on cross-examination, she testified that she and her husband "may have" subsequently used the names of "Robert and Linda Benson," "Colonel Andrew Barnett and Ruth Barnett," "Bruce and Elizabeth McLaine," "Mr. and Mrs. Richard Stanhope Ashbrook," "Edward Adams and Louise Adams," "Mr. and Mrs. John Adams," "William and Betty Van Kirk," and other names she "may have used" were: "Ruth Murphy, Arlene Johnson, Loretta Adams, Eileen Adams, Betty Williams, Betty Malone, June Adams, Mrs. J. Johnson, Barbara Palmer, Mrs. Larry Palmer, Mrs. Marie Johnston, Vivian Wilson, Patricia Starnes, Patricia Constianes, and Ruth McClafferty." She sold documents under various names and had checks made out to her in payment thereof in names other than "Mrs. Elizabeth Murphy." It is not too rash to consider that the jury may have considered that these methods used by her were to cover her traces.

Mrs. Murphy further testified that she had given birth to eight children since her marriage—a child each year from 1956 to 1963; that she had delivered all of her children without any medical assistance. The jury might well consider that this was not plausible; and that her testimony in this regard was to prevent anyone tracing where the Murphys had lived, since no one had any names of any physicians or locations of hospitals to go by. She also testified that during the period she had given birth to eight children during 1956 to 1963, she had visited, while carrying on an antique business,

about 5,000 antique shows and that she had about 75,000 customers during that time. She was asked if she kept a daily sales book and replied that she did. When asked where her daily sales books were, she stated they were out of the country, and refused to answer where. She further testified that the 210 documents found in the Murphys' possession amounted to only 1% of her total holdings. When she was asked where these holdings were stored, she refused to tell, except to say that they were out of the country, and were stored in several different countries; and that the reason she stated that she refused to tell where they were was that because the moment she told, they would be seized by the United States Government. When asked where her children had gone to school, she stated that she had educated them herself. Later this was somewhat qualified but the qualification had no proof behind it. She stated she had made many sales in her business, and that one sale was for $50,000; but she refused to give the name of the buyer or year of the sale. She also testified that she owned a two-masted schooner in which she cruised along the Atlantic coast coming into harbors from time to time, conducting her antique business either in cities along the seaboard or by driving by car to cities in the interior of the country. She testified the schooner did not have a number or license. Accordingly, it could not be traced as having been in any harbor or port. She stated that her residence during this period was the schooner. When asked whether she still owned the schooner, she replied that she did. Where was it? "In the Gulf of Mexico," she said. Where in the Gulf of Mexico? She refused to tell. Was it being kept for her by someone? "Yes," she replied, "a private party." What was the name of the private party? She refused to give the name. She testified she did not know where she was born, or anything about her father. In selling certain documents, she told the purchaser they had come to her from her father's estate in Canada. She admitted that this representation was false. Where the Murphys came from is a mystery. The place where they stayed, aside from their own statements of travel, can be proved only by others who saw them engaging in a few cities in selling documents, or examining rare books in libraries or archives. In a motion filed subsequent to his sentence, appellant Murphy alleged that neither he nor his wife was a citizen of the United States.

Mrs. Murphy's credibility was for the jury and apparently they did not think much of it. Appellant Murphy did not testify, contenting himself with cross-examining the Government's witnesses, examining his own expert witnesses, and using his wife as his principal witness. His contention was that the stolen documents were not genuine—which was not a defense against the claim that they were the property of the Government. His claim, in any event, was unsupported by any testimony. Moreover, not one of the expert witnesses sworn on behalf of appellants—and they constituted some of the outstanding authorities in the country—questioned the authenticity of any of the stolen documents found in the possession of the Murphys. The jurisdictional amount involved in the indictment was established by the undisputed and credible evidence. There is no contention made by appellants that the verdict of the jury, finding them guilty beyond a reasonable doubt, was not sustained by the great weight of the evidence.

All of the foregoing is set forth as the background of the issues raised in this case and it seems important in the light of such issues to have a full understanding of the character, credibility and conduct of appellants as disclosed by the evidence, and the credibility of appellants' chief witness, Mrs. Murphy.

Appellants claim that they were, to their prejudice, denied their constitutional right to a fair trial because of the conduct of the trial judge in making improper comments on the evidence, and by the trial court's cross-examination of, and expressed hostility toward, appellants and appellants' witnesses. Appellants

further claim that they were denied their constitutional right by the trial judge's refusal to permit subpoenas to issue to certain defense witnesses, and to permit them access to evidence seized from them and held by the Government; that they were denied effective assistance of legal counsel prior to, and during their trial.

To sustain appellants' claim of improper comment on the evidence by the trial judge, they refer to a statement of the judge made to their objection to the introduction of evidence as follows:

"The Court: The testimony of the witness, who has qualified as a Deputy Director of the National Archives, and a person who has been connected with that institution since 1934, and as Deputy Director I think since 1948, is to the effect that each and every exhibit, every document that is in those exhibits in front of him, from his own personal knowledge, were in the possession of the National Archives as late as August of 1962, and on the basis of that testimony I am asking you whether or not you have any objection to the admissibility of those particular exhibits without any windowdressing as to what you think.

Mr. Murphy: It isn't what I think. The Deputy Director of the National Archives—

The Court: (Interposing) Do you have any objection to these exhibits?
Mr. Murphy: I say I have objections to some of them, yes, sir.

The Court: What is the objection?

Mr. Murphy: They don't belong in the National Archives.

The Court: They are admitted."

The trial judge's statement above quoted is preceded by his question to the Deputy Director of the National Archives and the answer thereto as follows:

"The Court: Do you yourself have any knowledge of the fact that those particular documents were in the possession of the National Archives?

A. Well, I know that we moved in the records of the Attorney General's Office shortly after we got into business in the late 1930's and that these papers or papers exactly like them— your Honor, I have not by any means read or looked at all of the individual items in the National Archives, but I can testify out of my own knowledge at having looked at the register and having looked at the records of the Attorney General. There is no question whatsoever in my mind *that those records that are in those five boxes* were in the possession of the National Archives in the late August and early September, 1962.

The Court: All right. That is from your own personal knowledge?

A. Yes, sir.

The Court: All right.

A. My own personal knowledge of our records." (Emphasis supplied.)

The evidence discloses that the five boxes contained the 210 documents seized from the Murphys by the FBI.

It is further complained that the court prejudicially intervened at a point when a peculiarly disputatious witness was being examined by appellant, who asked:

"Q. You, as a dealer, would not return material to the Archives if it is supposed to be in the Archives, would you? I am talking about material of years past.

A. Well, I feel that material in my possession belongs to me."

The trial court then asked the following question:

"You don't mean, do you, madam, that if you knew that documents that were the property of the National Archives and found their way into your possession, and it could be established that the property was the property of the National Archives, that it is your testimony that you still feel you had a right to those documents?"

In answer to this question, which admitted of a simple answer, the witness started to argue in her answer:

"A. How sir, would it be established that they belonged in the National Archives?

The Court: Well, it has been established in this case, the documents have been identified by competent testimony as being the property of the National Archives.

A. Do they have cataloguing on the particular items?

The Court: They have different methods that have been presented here of identification, and witnesses have testified—and have explained different ways—as to a certain number of exhibits here as being the property of the National Archives. That is the testimony up to here. And the determination is for the jury, but that is the testimony. And on the basis of that testimony I have admitted these documents into evidence, because they have been, in the opinion of the Court, properly identified. Is it your testimony that if the National Archives was able to establish that the documents were the property of the National Archives, then you would still attempt to retain possession?"

The foregoing admitted of a simple answer. However, the witness continued:

"A. Well, sir, I still am trying to understand how they are identified."

The witness continued to carry on an irrelevant discussion with appellant when the Court again intervened and stated:

"The Court: Well, what you are telling me is that the testimony that has been given here isn't convincing, and whether it is or not is for the jury, but your position is that it isn't convincing even though you haven't heard it."

When appellant continued with a similar method of examination of the same witness, the Court sustained an objection, stating:

"You are invading the province of the jury here by these questions. It is for their determination, not the determination of this witness as to what she thinks about this identification or that identification. I have already indicated she hasn't heard the testimony, so she isn't competent to pass upon it. The ultimate determination will be made by this jury."

 These statements made by the Court during the examination by appellant, Robert Murphy, of this witness emphasized repeatedly that the determination as to whether the documents in question were owned by the National Archives was for the jury, and the Court's use of the word "established" referred only to the fact that the testimony of the Government's witnesses was plain and to the effect that the documents belonged to the National Archives, but that the evidence of such identification of the documents as belonging to the Archives was for the ultimate determination of the jury. There is no basis for any claim of unfair comment in the foregoing.

The transcript of testimony in this case, consisting of 1,540 typewritten pages, has been meticulously reviewed, studied and restudied for evidence of conduct on the part of the trial judge which was prejudicial to appellants' right to a fair trial. Among appellants' claims is the contention that the trial judge's comments were prejudicial and deprived them of their constitutional right to a fair trial. As heretofore stated, we find no evidence of any such improper comment. On the other hand, because of appellants' insistence on Robert Murphy acting as their own lawyer, there were countless instances where the trial judge repeatedly throughout the trial was concerned with their receiving the fairest treatment, and time and again ruled out evidence as hearsay, to appellants' advantage, without objection being made. The Court, on numerous occasions, further insisted that the testimony of government witnesses be linked to the rele-

vant issues and on failure so to qualify, ruled such testimony inadmissible.

Appellant, Robert Murphy, acting as the lawyer for both appellants, insisted on making long and repeated statements of facts without supporting testimony during his examination of witnesses. Throughout the trial, he was trying to get before the jury his own story without taking the witness stand. During cross-examination of an FBI witness, he charged him with perjury; and ordered one of his own witnesses not to answer a question asked by government counsel. As a result of these episodes or tirades, the trial judge, out of the presence of the jury, said to appellant:

> "I am warning you again that you are not fooling anybody here. This practice that you are indulging in is a whole lot older than you are, and you are making every effort that you can to get your defense in by these statements.

> "These witnesses are produced here and sworn under oath to give testimony, and they are not required to be insulted by you, and that is just what you are doing with a lot of them, so that you are going to refrain from it or suffer the consequences."

There was no prejudicial hostility shown by the trial judge to appellants or to their witnesses. The jury had before it a case involving thievery of historical documents of national importance, as well as perjury, repeated evasion in her testimony on the part of appellants' principal witness, appellant Elizabeth Murphy herself, and possession of documents and books that had been stolen from the National Archives and great libraries. Wherever such documents had been stolen, the proof was to the effect that appellants had been there a short time before; and the stolen documents and books were afterward found in their possession. Under all of the evidence, the jury was justified in finding both appellants guilty beyond a reasonable doubt of the charge in the indictment.

■ Claims that the appellants were denied their constitutional right by the Court's refusal to permit the issuance of subpoenas to defense witnesses are without any merit whatever. Subpoenas were issued to many witnesses as requested by appellants and the fact that the Marshals in different states were unable to find the witnesses requested, constituted no deprivation of appellants' rights.

Since the foregoing claim of error is so strongly relied upon by appellants on appeal, we feel the complete answer is evidenced in the transcript set forth in the margin.[1] The Court then cited the

---

1. "The Court: Now, Mrs. Murphy,—I guess this is your writing—you have requested the Government to subpoena two more witnesses. Mr. McMurtie of Lincoln Life Museum in Fort Wayne, Indiana. What do you expect to establish by the testimony of that witness?

Mr. Murphy: Sir?

The Court: What do you expect to establish by the testimony of Mr. McMurtie of Lincoln Life Museum in Fort Wayne, Indiana? You requested the subpoena.

Mr. Murphy: I am aware of that. She has on at least six occasions taken material, some which is in question here, some which some of our previous witnesses are reluctant to acknowledge—they cannot recall at the moment—to Mr. McMurtie, and I hope his memory is better than the others.

The Court: Well, then, 'John G. Ross, 12 West Madison, Chicago, Illinois; a collection of letters bought for his son in 1962.' Bought for whose son?

Mrs. Murphy: He bought it for his son.

Mr. Murphy: They dealt back and forth.

The Court: He couldn't have bought any of the 210 exhibits that are here as the basis for this lawsuit, because they are all in court, so, whatever his testimony would be, would be extraneous to anything we have here, so he will not be subpoenaed. And Mr. McMurtie will not be subpoenaed, either, because there has to come an end to litigation, and the Government has cooperated rather extensively to the extent they brought witnesses from New York, from Washington, and many other sections of the community, and they appeared here and the questions by the Murphys have been on many matters that have nothing to do with the lawsuit."

subpoenas that had been issued by the Government:

"One, Frank J. Hullett was excused by the defendant;

Two, Edward J. Kay was excused by defendant;

Three, John Adams was excused by the Court as having nothing to do with the matter here for consideration. S. Mickelson—is that the man in Philadelphia?

Mr. Googasian (District Attorney): No, he is in Washington, your Honor. He is in Europe until July 19th.

The Court: Mr. Paul Angle was served and testified.

Mr. Ralph Geoffrey Newman was served and is here, and he didn't handle the transaction.

Julia Sweet Newman was served and appeared here as a witness.

Mr. Jones just left the stand.

Mr. Mendelsohn was here on a writ from Milan.

Dr. McGinnis was here from his duties at the federal correctional institution, and it was just a trip in vain for him. Dumouchelle was here, and served and testified.

And Mr. Bolan was here and testified. Mary Benjamin was brought here from New York and appeared and testified.

Charles Hamilton was not served.

Elizabeth Bronson was served.

Virginia McGraw was not served; not located at the address given. So the only witness in this long list of witnesses, 16 in all, who has not been accounted for is Elizabeth Bronson.

Mr. Googasian: She was, I think, excused. She was the woman from Birmingham that was 75 years old.

The Court: Oh, I see. Yes.

Mr. Googasian: And couldn't make the trip.

The Court: She couldn't make the trip because of her age.

Mrs. Murphy: Your Honor, Mr. Hamilton is also very important to the case, and I know he is in New York.

The Court: Well, maybe he is in New York, madam, but an attempt was made to have him served, and he has not been served. Apparently the subpoena was sent to the United States Marshal in New York City, if that is where he is, and an effort was made to serve him at his place of business, probably his home, and he wasn't served, and that is all the Government can do. It has attemped to serve him."

■ Appellants claimed that the Court's denial of their access to other evidence seized by the Government constituted prejudicial reversible error. The ruling of the Court caused no injury to appellants or prejudice to their case. The main point of appellants' argument in this regard was that they had the right to the return of other property and documents which were seized by the Government at the time of their arrest and were not exhibits in the case. This property and the other documents were being held so that it could be determined whether they were stolen from other institutions, and could be used as exhibits in numerous subsequent actions commenced against appellant in different parts of the country. But the withholding of this property from appellants resulted in no error or prejudice to them in this case.

Appellants finally contend that they were denied effective counsel prior to trial and during trial in contravention of their rights under the Constitution.

It appears that appellants were arrested on the evening of January 2, 1964, and two hours after their arrest were taken before the United States Commissioner where bond was set for appellant Murphy in the sum of $25,000, and a personal bond of $10,000 was set for his wife. Appellant, Robert Murphy, could not make bond, but his wife was able to do so, and she was then released. Both appellants were arraigned on January 8, 1964, before Chief Judge Freeman.

Thereafter, on the same day, upon the request of appellants, Judge Freeman appointed counsel for them. There is no question that appellant, Robert Murphy, was ill at the time of his arrest and probably seriously ill during a subsequent period as a result of an active liver disease. By medical orders, he was confined to strict bed rest because of an exacerbation of chronic hepatitis. He was carefully examined on at least two occasions by a consultant in internal medicine, who advised continued use of digitalis for appellant's tachycardia, phenobarbital in rather generous amounts for "this very hyperactive man," vitamin K–1, and other drugs and treatment.

Appellants, apparently, contend that they were denied effective assistance of counsel in violation of their constitutional rights because they were without counsel when arraigned. There is no evidence of appellants' assertion that they were denied such effective assistance of counsel prior to trial. In Stith v. United States, 124 U.S.App.D.C. 81, 361 F.2d 535 (1966), it was claimed that appellant in that case had been improperly denied effective assistance of counsel prior to trial and the court, in passing upon this contention, said:

"Appellant's Sixth Amendment claims are founded upon * * * the absence of counsel prior to and at arraignment * * *. As to the former, as well as that part of the second claim which relates to the absence of counsel between preliminary hearing and arraignment, we think the first obstacle in appellant's path is that the failure to raise these asserted deficiencies either before trial or at the trial itself, precludes their effective assertion for the first time on appeal. Appellant was provided with counsel five days after arraignment, and trial was not reached for nearly two months thereafter."

■ While appellants were entitled to counsel at every step of the proceeding, that requirement extends only to the requirement of counsel at every step where an accused who is without counsel may be prejudiced. McGill v. United States, 121 U.S.App.D.C. 179, 348 F.2d 791 (1965). In McGill the defendants were arraigned and entered pleas of not guilty on May 6, 1964. Counsel then was appointed to represent them on May 6, 1964. On the same claim that appellant Murphy attempts to raise here, the court in McGill said:

"* * * * we see no basis for concluding that the Constitution requires the presence or assignment of counsel at a point when and where there is no reasonable possibility of prejudice to the rights or position of an accused, as in these cases." (p. 793).

■ From the above it is plain that appellants were not denied their right to the effective assistance of counsel prior to trial.

On May 1, 1964, appellants pleaded not guilty, and trial commenced on June 9, 1964. Prior to that time, on April 7, 1964, both appellants informed the Court that they had discharged their court-appointed counsel and appellant Robert Murphy then informed the Court that he, himself, would act as defense counsel. Mr. Ivan E. Barris, an able lawyer and recognized as proficient in the practice of criminal law, who, on January 8, 1964, had been appointed by the Court as counsel for appellants, then asked for authority to withdraw as such counsel, and the Court granted his request.

With the trial scheduled to commence on Tuesday, June 9, 1964, appellants, on June 4, 1964, requested by letter that the trial judge appoint as their "advisory counsel" either Honorable John Feikens, former United States District Judge in Detroit, or Honorable George Woods, former United States District Attorney. The Court observed that this was too short a time to secure such eminent lawyers as "advisory counsel." However, when the case was called on June 9, 1964, appellant, without counsel, indicated he was ready to proceed.

On the afternoon of the second day of trial, appellant made further reference to his request for "advisory counsel." The Court denied this request. There was no showing that Judge Feikens or Mr. Woods, lawyers with large and important practices, could, over the weekend, have arranged to act as "advisory counsel" for appellants. Nor could they have been obliged to act in such capacity by the Court. Mr. Barris had acted up to the time of appellants' request of his discharge on a number of occasions during the proceedings and had shown vigorous advocacy on appellants' behalf on a complex motion for return of certain property and to suppress evidence on March 16, 1964. Appellants, in their letter to the Court stating that they had discharged Mr. Barris, made no claim that he was not a competent lawyer or that he had not properly represented them up to that time. The only basis for the discharge of counsel which appellants mentioned was that appellant, Robert Murphy himself, would act as defense counsel.

The principal contention of appellants on this appeal can be largely summed up in their claims that the trial court had been unfair and prejudicial in his conduct, in his improper comments to appellants' prejudice, in unfairly refusing to grant continuances to secure witnesses that appellants desired to have subpoenaed, and in his denial of counsel to them. None of these contentions are sustained by the record. Judge Thornton was assiduous in his efforts to protect the rights of appellants who had discharged their own able court-appointed lawyer. Throughout the case, appellant, Robert Murphy, showed a legal skill, however acquired, and an unusual ability to get pages of hearsay before the jury.

Perhaps appellants' real feelings toward the trial judge were manifested at the time of their sentencing. Both appellants were before the Court. Judge Thornton had sentenced the wife to a term of imprisonment of ten years, specifying that she might be eligible for parole at such time as the Board of Parole might determine.

After sentencing Murphy's wife to prison, Judge Thornton called on appellant Murphy, asking him if he had anything to say before the Court imposed sentence. Appellant Murphy replied: "Well, just let me say that you treated me fair. I can't say you didn't." Thereafter, he went on to say that the Court didn't have the courtesy "to look into certain complaints that did have justification." There was no question that he had made a number of complaints about many people—both before and during his trial. But such complaints had no bearing on the fairness of the trial judge or on any constitutional issues.

We find no deprivation of appellants' constitutional rights and no prejudicial conduct on the part of Judge Thornton. Throughout, he treated appellants fairly. He was firm, but patient; and insisted only that the case be tried in an orderly way and in accordance with the law.

The judgment is affirmed.