UNITED STATES of America,
Plaintiff-Appellee,

v.

Phillip Brooks BARKER et al.,
Defendants-Appellants.

Nos. 76-1767 to 76-1769.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 6, 1976.

Decided March 22, 1977.

As Amended June 1, 1977.

Carol W. Johnson, Hopkinsville, Ky. (Court-appointed CJA), for defendants-appellants.

George J. Long, U.S. Atty., James H. Barr, Louisville, Ky., for plaintiff-appellee.

Before PHILLIPS, Chief Judge, and EDWARDS and McCREE, Circuit Judges.

McCREE, Circuit Judge.

Phillip Brooks Barker, Robert Dale McKee and Perry Duane Caudle appeal from their convictions on both counts of an indictment for violation of 18 U.S.C. § 2113(a), taking money from a FDIC-insured bank by force, violence or intimidation, and for violation of 18 U.S.C. § 2113(d), assaulting or putting lives in jeopardy by the use of a dangerous weapon while committing a violation of 18 U.S.C. § 2113(a). They were convicted by a jury after a five day trial. Because the two counts were merged, all defendants were sentenced, only on the second count, to twenty-five years imprisonment, the statutory maximum. The trial court specifically found that neither McKee nor Caudle would benefit from the provisions of the Federal Youth Corrections Act.

On July 15, 1975, three young black men, carrying firearms, and wearing sunglasses, handkerchief masks and wigs, robbed the Planters Bank of Elkton, Kentucky. They escaped in a red Chevrolet automobile with approximately $40,000. The bank manager's pursuit of that car was halted when an unidentified person in a white Pontiac brandished a shotgun at the manager.

Most of the contentions in this appeal concern the government's efforts at trial to identify these two vehicles and to connect them with appellants.

The red Chevrolet in which the bandits drove away from the bank was found abandoned under a bridge. An automobile salesman testified that shortly before the robbery he had sold the car to a man who called himself Joe Jones. At trial, the salesman identified the buyer as Thomas McKee, brother of defendant McKee. He testified that the buyer gave the address of defendant McKee's great uncle, Frank Waddell.

An FBI fingerprint expert testified that fingerprints of all three defendants were found on the car's rear view mirror. A defense fingerprint expert was permitted by the trial judge to testify that only defendant McKee's fingerprints were on the mirror. However, the court refused to rule that the defense witness was qualified as an expert to present opinion testimony. Instead, it instructed the jury that the witness did not qualify as an expert because his credentials were inadequate. The judge further instructed the jury that it could consider only opinions expressed by an expert.

Defendants McKee and Barker testified that they had "checked out" some used cars about a week before the robbery and that they "could have" touched a rear view mirror at that time.

The FBI obtained fingerprint and handwriting specimens from Thomas McKee for comparison with the fingerprints and signature on the sales receipt for the red Chevrolet. The government introduced no proof that either Thomas McKee's fingerprints or his handwriting were on the sales receipt.

It was stipulated that the FBI laboratory report showed that none of the *defendants'* fingerprints were on the receipt. However, although the FBI fingerprint expert testified that he had compared Thomas McKee's prints with the fingerprints on the receipt, the government apparently failed to produce the report of that examination, in spite of the fact that the defense had obtained an order for its production. Nor did the government's handwriting expert, who failed to identify the writing on the receipt as Thomas McKee's, appear to testify at trial, despite the fact that defendants had subpoenaed him.

The government also showed that the Chevrolet that "Joe Jones" purchased was blue, black and white when he acquired it, and that defendants had been seen with a blue and black 1963 or 1964 Chevrolet. Shortly before the robbery, defendants introduced evidence that Caudle's brother, Kenneth Jagoe, had owned a blue 1964 Chevrolet and had lent it on occasion to Caudle, and had sold the car after the robbery. Jagoe and the person to whom he sold the car identified a photograph of it that showed that the car was still blue.

It was stipulated by the parties that an FBI laboratory report concluded that the "getaway" Chevrolet had been painted with a red enamel. An auto parts salesman testified that defendant Caudle had asked him how much primer paint would be needed to paint a car. The salesman did not himself sell primer paint to Caudle, and he did not know whether or not another salesman in the store had sold anything to Caudle. A government rebuttal witness testified that some primer paints have enamel finishes. The defense subpoenaed the FBI laboratory expert who had prepared the report which was stipulated in evidence. Nevertheless, the witness did not appear to testify.

The government also showed that Barker owned a white 1967 Pontiac. Barker was seen driving his car toward Elkton on the morning before the robbery. Another witness said that he saw a 1968 white Pontiac traveling from the direction of Elkton toward Hopkinsville, where defendants lived,

on the afternoon following the robbery. There was evidence that the white car ran, out of control, through a fence and into a cornfield along the escape route during that afternoon. The government showed that there were dents in Barker's car after the robbery that had not been there shortly before the robbery. The FBI conducted tests comparing soil and plant fragments found on Barker's car with samples from the cornfield, and comparing the paint on Barker's car with a white substance that had been found on the broken wires of the fence between the cornfield and the road. The results of these tests were inconclusive and reports to that effect were received in evidence by stipulation. Nevertheless, the defendants secured subpoenas to compel the attendance of the laboratory technicians who had prepared the reports, but these efforts were frustrated by the government's failure to honor the subpoenas and the court's failure to enforce them.

An FBI technician who did come from Washington testified that a piece of chrome found along the theorized escape route matched another piece of chrome found in the trunk of Barker's car. A towel found in Barker's car was smeared with red paint, the same color as the paint on the 1964 "getaway" Chevrolet.

Furthermore, on the afternoon of the robbery a local farmer saw a young black man at a location along the theorized escape route changing a tire on a white Pontiac automobile manufactured in the 1960's. The farmer later found four lug nuts at that location. When the police searched Barker's car four days after the robbery, it lacked three lug nuts. Although the farmer was only 25 feet from the man changing the tire, he was unable to make a courtroom identification of any of the defendants.

The government showed that within the two months immediately after the robbery the defendants and some of their relatives had in their possession currency bills, some of them consecutively numbered, which had been shipped to the Planters Bank two weeks before the robbery. More than half of the bills in that shipment had been placed in circulation before the robbery occurred. The bait money and other particular bills known to have been taken from the bank were not recovered.

Although prior to trial no eyewitness had been able to identify any of the robbers, at trial one of the bookkeepers and one of the tellers identified McKee and Caudle, respectively. The bookkeeper had seen newspaper pictures of the defendants after they had been arrested. The teller's identification rested primarily on the fact that Caudle's "very funny, mean, wild look out of his eyes" from the defense table was the same as that of one of the robbers.

During the robbery, one of the bandits was addressed as Butch, which was Caudle's nickname. Caudle testified that he was no longer known by that name. Each defendant testified that he was engaged in a specific activity other than robbing the Elkton bank at midday of July 15, and presented witnesses in support of his alibi.

We have recited the highlights of the evidence in detail in order to emphasize that the government's case was essentially circumstantial, with the exception of the identifications by the teller and the bookkeeper. Neither of these witnesses had seen any of the defendants before the robbery, and neither was able to make a pretrial identification. Because eyewitness identifications by strangers based upon fleeting observations made in stressful circumstances are frequently inaccurate, cf. Levine and Tapp, *The Psychology of Criminal Identification,* 121 U.Pa.L.Rev. 1079 (1973), the circumstantial evidence linking the defendants to the two "getaway" cars is particularly important.

Accordingly, we consider initially appellants' contentions [1] that they were deprived of a fair trial when the United States Mar-

---

1. Although many objections were not. raised, either at trial or on appeal, individually by counsel for each of the defendants, both the trial and the appeal appear to have been conducted on the assumption that each defendant joined in the objections of other defendants. We therefore treat each issue as having been raised by all three defendants, unless otherwise noted.

shal failed to properly serve their subpoenas for the FBI laboratory technicians whose test results failed to support the government's attempt to establish that the defendants had bought or used the "getaway" cars, and when the trial judge failed to enforce their subpoenas. They argue that a continuance should have been granted until the government complied with the subpoenas. They also contend that the court should have stricken the testimony of the government rebuttal witness, who testified about a matter which would have been the subject of a subpoenaed witness' testimony, after the government represented that it would not elaborate on that subject matter.

Because this is a direct appeal, we are concerned, not only with the specific commands of the Constitution and applicable statutes, but also with our supervisory responsibility to assure fair judicial and prosecutorial practices. And our supervisory power requires us to scrutinize with particular care claimed encroachments on areas protected by specific Constitutional safeguards.

The Sixth Amendment guarantees the right to defendants to have compulsory process. Although the district court issued subpoenas as requested by the defendants, we hold that the defendants were deprived of a fair trial when they were denied their right to have these subpoenas for witnesses necessary for their defense served and enforced. We therefore reverse.

### THE DEFENSE SUBPOENAS

On Tuesday, November 25, Barker filed a motion under the Federal Rules of Criminal Procedure, Rule 17(b), which provides for the issuance at government expense of subpoenas for witnesses for indigent defendants. The motions were granted, and the Marshal received the subpoenas on the following day. Although the trial was scheduled to begin on Monday, December 1, the Marshal's office took no action during the next four days, within which the Thanksgiving holiday fell.

The subpoenas required the attendance of FBI technicians who had performed tests for the government. They commanded the appearance of laboratory technicians who had determined that soil and vegetation found on Barker's white pontiac did not match samples taken where the white escape car had run off the road along the supposed getaway route, and that the outer layer of paint on the abandoned red "getaway" Chevrolet was enamel instead of primer.[2]

Although negative evidence frequently has little probative value, the paint report took on unusually great potential significance in this case because the government introduced evidence to show that Caudle had sought to purchase a sufficient quantity of red primer paint to cover an entire automobile. The government further sought to reinforce its primer paint argument by introducing rebuttal testimony by a paint expert that many primers contain enamel, despite the fact that it had implied that it would be bound by the conclusions in the laboratory report.

Although the subpoenas did not state the names of the technicians, they specified the

---

**2.** The defendants also obtained a subpoena for the FBI expert who had compared Thomas McKee's signature with the signature on the sales receipt for the blue 1964 Chevrolet. That expert did not appear, either. However, defendants did not make specific arguments about the relevance of that expert's testimony when a continuance was sought. Furthermore, the defendants do not refer in this appeal to the failure to serve and enforce that subpoena.

In this regard, however, defendants assert that the report on the handwriting comparison, as well as a report that showed the failure of the government fingerprint expert to match Thomas McKee's fingerprints with the fingerprints found on the receipt, were not provided to the defense as required by the district court's discovery order. The defendants assert that they were unaware at trial that reports on those comparisons had been prepared. The government refers to the reports in its brief in this appeal, although it never specifically states that the reports were given to the defendants. We assume that the reports would be made available to the defense pursuant to an appropriate discovery order before the new trial.

date, file numbers, and laboratory numbers of the reports which had been made available to defendants earlier in November pursuant to a discovery order of the district court. The government does not contend that the subpoenas were insufficient.

On Monday morning, the first day of the trial, the Marshal approached the Assistant United States Attorney in charge of the case, M. Stephen Pitt, and asked, "What should I do with these? I don't know who to serve." Pitt replied that the Marshal should serve the subpoenas on Hillard Thorpe, the FBI agent in charge of the case, who was apparently present during the conversation. "If you've got to serve them, serve them on him." Agent Thorpe, in turn, made no efforts to secure the attendance of the witnesses. Instead, he "referred the matter to Mr. Pitt, [who] said he would take care of it."

Defense counsel asked Agent Thorpe what he planned to do about the subpoenas which had been served upon him. Agent Thorpe responded that he would talk to Pitt about the matter. When counsel spoke to Pitt, also that morning, he assured them that the laboratory technicians would be present so that the defense could call them as witnesses. When counsel learned on Wednesday that the technicians would not in fact appear to testify, they sought a mistrial or a continuance until the technicians could appear. That motion was denied. They also sought to examine Thorpe on avowal in order to determine what efforts had been made to secure the attendance of the technicians, and whether they could be produced to testify by Friday, when the defense case-in-chief was scheduled to be presented. Agent Thorpe stated that he could make an inquiry, but the court reaffirmed its earlier ruling denying the continuance.

The court based its ruling on three factors. First, it determined that the technicians' testimony would not be "important, essential and vital ·. . . to the defense of this case," particularly because the prosecution would stipulate the truth of the findings of the reports. Second, the court de-

termined that the expense to the government was unwarranted in light of the lack of necessity for *personal* appearances. Third, the court stated that counsel failed to exercise diligence, because they had waited until Tuesday to seek the subpoenas for appearances at the end of the following week.

The defendants also asked that, at the very least, the Marshal be instructed to attempt to secure the attendance of the technicians by Friday. Nevertheless, the court ruled that the Marshal had already done all he could do by serving Agent Thorpe.

## THE FAILURE TO ENFORCE THE SUBPOENAS OR GRANT A CONTINUANCE WAS ERRONEOUS

■ Although the decision whether or not to grant a defense subpoena for the production of witnesses at government expense is ordinarily committed to the discretion of the trial court, see *United States v. Rigdon,* 459 F.2d 379 (6th Cir.1972), *cert. denied,* 409 U.S. 1116, 93 S.Ct. 917, 34 L.Ed.2d 700 (1973), nevertheless it is important to bear in mind that the right of an indigent criminal defendant to subpoena witnesses rests not only on Rule 17(b), but also on the Sixth Amendment right to compulsory process, *id.,* 459 F.2d at 382 (Edwards, J., dissenting), and on the Fifth Amendment right not to be subjected to disabilities by the criminal justice system because of financial status. See, *e.g., Bandy v. United States,* 296 F.2d 882, 887–8 (8th Cir.1961), *cert. denied,* 369 U.S. 831, 82 S.Ct. 849, 7 L.Ed.2d 796 (1962); *Taylor v. United States,* 329 F.2d 384, 386 (5th Cir. 1964). The latitude afforded the district court in making this determination is therefore considerably narrower than it is with respect to other decisions committed to its discretion. See *Welsh v. United States,* 404 F.2d 414 (5th Cir.1968).

Rule 17(b) formerly required the defendant to state the name and address of each witness, describe the testimony expected from each, and

1020

show that the evidence of the witness is material to the defense, [and] that the defendant *cannot safely go to trial without the witness* . . .. (emphasis supplied).

In 1966, however, the rule was amended to require only a "satisfactory showing that . . . the presence of the witness is necessary to an adequate defense." The new language of the rule places a far less onerous burden on the defendant than did the old language. *United States v. Rigdon,* 459 F.2d 379, 380 (6th Cir.1972), *cert. denied,* 409 U.S. 1116, 93 S.Ct. 917, 34 L.Ed.2d 700 (1973).

■ The preliminary showing required of a defendant under the amended rule is that the witness is "necessary" to an adequate defense. This requirement must be read in light of the Fifth and Sixth Amendment rights which the rule implements. Accordingly, the word "necessary" must be read to mean relevant, material and useful to an adequate defense, see *United States v. Greene,* 497 F.2d 1068, 1079 (7th Cir.) *cert. denied,* 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1974), because necessity, in the strictest sense of the word, cannot in most instances be anticipated at the outset of a trial, at least without a complete disclosure of the theory of the defense. The new rule was intended to avoid the requirement that a defendant make such a disclosure in order to obtain subpoenas. See Notes of the Advisory Committee on Rules.

■ We agree with the standard adopted by the Fifth and D.C. Circuits:

"... if the accused avers facts which, if true, would be relevant to any issue in the case, the requests for subpoenas must be granted, unless the averments are inherently incredible on their face, or unless the Government shows, either by introducing evidence or from matters already of record, that the averments are untrue or that the request is otherwise frivolous."

*Greenwell v. United States,* 1963, [115 U.S.App.D.C. 44], 317 F.2d 108, 110. That test places the burden of showing frivolity or abuse of process on the Government, where it properly belongs. *Welch v. United States,* 404 F.2d 414, 417–8 (5th Cir.1968) (footnotes omitted). See also *United States v. Tate,* 419 F.2d 131, 133 (6th Cir.1969). Once the defendant has made a "satisfactory showing," the government may seek to establish abuse of process. For example, the government may be able to show that an alleged alibi witness was incarcerated at the time of the offense, *United States v. Conder,* 423 F.2d 904 (6th Cir.1970), or that the desired witnesses have been interviewed and have indicated that they would make no statement. Indeed, a trial judge will often initiate an inquiry to determine whether witnesses are available and useful. See, *e.g., United States v. Morris,* 451 F.2d 969, 972 (8th Cir.1971). In this appeal, however, the district court decided not to order Agent Thorpe, who was in charge of the case, to contact his superiors in Washington to determine whether and how quickly the laboratory technicians could come.

If we limited our inquiry about the necessity of the witnesses sought to be subpoenaed to the affidavit supporting the motion, we would hold that the district court did not abuse its discretion because the affidavit alleges necessity in only the most general terms:

. . . that the testimony of the above-named persons will be necessary for an adequate defense of Perry Caudle at the trial; that the above-named persons will testify from personal knowledge concerning the facts and circumstances surrounding the alleged robbery of the Elkton Branch of the Planters Bank of Todd County; that the testimony of each of them is independently essential to an adequate defense and their testimony will not be cumulative; . . ..

■ Despite the fact that the 1966 amendments to Rule 17(b) were intended, in part, to eliminate any requirement that an indigent defendant disclose his defense, nevertheless, we have repeatedly held that generalities like those set forth in this affidavit are insufficient to make out a "satis-

factory showing" that the witnesses are needed. *Rigdon, supra,* and *Conder, supra.* The district court, however, issued the subpoenas without requiring any further showing.

■ Nevertheless, on the following Wednesday, when the defendants complained of the government's failure to obey the subpoenas and sought a continuance and a direction to the government to make further efforts to produce the witnesses, the district court held a hearing on the need for the witnesses.[3] At that time defendants presented more detailed reasons to support their motion, and only then did the trial judge indicate that the showing which defendants had made was insufficient. In these circumstances, we believe that it would be unfair to consider only the defendants' earlier, conclusional showing in deciding whether they carried their Rule 17(b) burden. Instead, we shall consider, as did the trial judge, the reasons and arguments advanced at the Wednesday hearing to be defendants' showing of necessity.

At the hearing, defendants made no specific arguments that the testimony either of the soil and vegetation technicians, or of the handwriting expert who compared Thomas McKee's handwriting exemplar with the signature on the sales receipt for the 1964 Chevrolet, would be "relevant . . . to [an] issue in the case . .." Because the general statements in the affidavit which was filed *ex parte* before the trial were insufficient, we conclude that a "satisfactory showing" of the need for those witnesses was not made.

**3.** Rule 17(b) requires the court to make its decision *ex parte* on the application for subpoenas. It is therefore understandable that the trial judge apparently did not consider fully the need for the witnesses, nor the burden on the government, until the issues were sharply focused at a later, adversary hearing. In effect, then, it was not until the hearing on the motions for enforcement and a continuance that an actual determination, supported by statement of reasons, was made about the propriety of the issuance of the subpoenas.

One court has treated a conditional grant of a Rule 17(b) subpoena as an implicit determina-

■ However, the defendants argued that the paint technician's testimony would have shown that the red Chevrolet had been painted with *enamel* paint, although the government's evidence showed that Caudle had inquired about, and perhaps had purchased, *primer* paint to cover an automobile.

The district court stated that the defendants had failed to show that the subpoenas were needed in order to procure "important, essential and vital testimony to the defense of this case . . ." As we have stated, however, the appropriate standard is whether defendants have alleged that the witnesses will testify about facts that are relevant to any issue in the case.

The court also relied in part upon its determination that bringing the experts in person from Washington in order to give live testimony would have no "pragmatic or practical helpful results," and would be "an unnecessary expense," because the government was willing to stipulate to "the exculpatory matter that had been uncovered during the course of these examinations and laboratory tests . . . .." The report on the paint tests was read into the record by McKee's counsel as follows:

The K–1 section of metal from the Chevrolet—and that is this piece of material that was taken off of the Chevrolet—was painted in the following manner: (Which I understand to be layers going from the top).

1. Red-brown enamel.
2. Dark blue enamel.
3. Gray primer.
4. White nitrocellulose lacquer.

tion that the defendant had carried his minimal burden of making a "satisfactory showing." *United States v. Hathcock,* 441 F.2d 197, 200 (5th Cir.1971). Nevertheless, for clarity we have divided our analysis into two parts. First, we determine whether an adequate showing was made. Second, we discuss whether the Wednesday motions were properly refused, in light of our determination that an adequate showing had been made, and in light of the failure of the government to make a good faith effort to serve and to comply with the subpoenas.

5. Silver-colored metallic enamel.
6. White acrylic lacquer.
7. Gray primer.
8. Black primer.

The K–2 can of paint from the store [where Caudle had asked how much primer paint would be needed to paint an entire automobile] contained a brown nitrocellulose primer which was different in color and type from the red-brown enamel top layer on the K–1 specimen from the Chevrolet.

Rule 17(b), considered in the light of the Constitution, was held to require the furnishing of compulsory process to an indigent defendant to assure the presence of an expert witness even when a transcript of that witness' sworn testimony at an earlier trial was available. *United States v. Julian,* 469 F.2d 371, 375 (10th Cir. 1972). To require these defendants, solely because of their indigency, to accept an unsworn laboratory report in lieu of the live testimony of the persons who prepared it is an even greater deprivation of fundamental fairness. See *United States v. Edwards,* 469 F.2d 1362, 1369 (5th Cir. 1972).

Live testimony was particularly important for these defendants, because although the report described different layers of paint on the Chevrolet as "enamel," "lacquer" and "primer," and thereby implied that these were different kinds of paint, it never specifically distinguished them. Although the report did specify that the outer layer on the car was "different in color and type" from the paint that had been purchased by an FBI agent from the store at which Caudle had made his inquiry, the defendants contended that the government might advance the argument that enamel and primer are similar. The prosecutor responded, "Your Honor, to do away with any problem here at all, the United States will not make that argument."

In spite of this representation, the government called, over objection, a paint expert as a rebuttal witness. This expert testified that there are three types of primer: enamel primer, acrylic enamel primer, and lacquer primer. The only relevance that this testimony could have was to permit the jury to infer that the description in the report that the top layer of paint on the "getaway" Chevrolet was "red-brown enamel" was not inconsistent with the insinuation that Caudle had purchased primer with which to paint a car. Thus the prosecution was enabled to place a live expert before the jury, although defendants were relegated to reliance upon an uninterpreted written report.

In his summation, the prosecutor argued that the Chevrolet was in fact painted with red primer. This argument dramatically demonstrates the defendants' need for the FBI technician's live testimony about the results of his tests. We determine that the defendants made an adequate showing of the need for the subpoenas.

Nevertheless, the government contends that the defendants did not exercise due diligence in seeking the subpoenas, because the motion for the issuance of subpoenas was not filed until about ten days before the witness' appearance was sought. Because the defendants made an adequate showing of the need for the subpoenas, the burden is upon the government to demonstrate that because of their lack of diligence, the last-minute application for the subpoenas constituted an abuse of process.

■ Of course, neither the Compulsory Process Clause nor Rule 17(b) guarantees the actual attendance of witnesses sought by the defense. *United States v. Murphy,* 413 F.2d 1129, 1139 (6th Cir. 1969). Nevertheless, the government must itself exercise due diligence in a good faith effort to secure the attendance of subpoenaed witnesses. *Johnson v. Johnson,* 375 F.Supp. 872, 875 (W.D.Mich.1974); *Maguire v. United States,* 396 F.2d 327 (9th Cir. 1968). And see generally, Westen, *Compulsory Process II,* 74 Mich.L.Rev. 191, 277–81 (1975).

■ Thus if the government had made a good faith effort, and the witnesses were unavailable because of the defendants' late application for subpoenas, the issue of defendants' due diligence would be properly before us. In this appeal, however, because the Marshal made no effort to serve the

subpoenas on the witnesses who worked for the FBI in the District of Columbia, and because the government made no effort to contact Washington when the FBI agent in charge of the case was presented with the subpoenas for the Washington witnesses, the burden must rest upon the government to show that the witnesses would not have attended the trial when needed even if the government had "exercise[d] due diligence in a good faith attempt" to secure their presence. See *Maguire, supra.*

We therefore hold that it was error for the trial court to have refused to grant a continuance during which the government could exercise sufficient diligence to secure the attendance of the witnesses. Particularly in the light of the government's violation of its stipulation and of the largely circumstantial nature of the evidence, we cannot conclude that this error was harmless.

### OTHER OBJECTIONS

Although we hold that the government's failure to serve and the court's refusal to enforce defendants' subpoena for the FBI paint expert denied defendants their right to a fair trial, we also conclude that there were other serious errors at trial. Because some of these errors might be repeated if the defendants are retried, we discuss them briefly.

#### The Defense Fingerprint Expert

We address first the district court's refusal to qualify Mr. Albert Holbert to testify as a fingerprint expert for the defense.

After taking a training course, Holbert worked for about a year and a half as a fingerprint analyst for the State of California. During that period he interpreted the patterns and searched the files for identification of thirty or forty fingerprints each day. After he left that position in October 1963, he worked at a variety of jobs involving little or no fingerprint work. For six

months before trial, Holbert had been employed as an investigator by the Kentucky Public Defender's office. Although that office employs no full-time fingerprint experts, one of Holbert's tasks is fingerprint work. This was the third occasion in the past six months upon which Holbert had been requested to do fingerprint comparisons.

During the voir dire, the prosecutor showed that this was the first time Holbert had testified in court, that he had not belonged to a professional society since his service in California, that he no longer subscribes to any professional journals, and that he had no degree in fingerprint analysis.[4] On the basis of that information, and the time which had passed between Holbert's work in California and the trial, the prosecutor moved the court to refuse to qualify Holbert as an expert. The court agreed, over defense objections, and told the jury that because of the length of time since Holbert had

> had a firsthand working knowledge—I don't feel that he possesses the qualifications that would entitle him to this high esteem in . . . a very precise field, so he will not be permitted to testify as an expert.

Inexplicably, the judge then permitted Holbert to testify and to offer his opinions about the differences between the exemplars of defendants Barker and Caudle and the latent prints that had been discovered on the rear-view mirror of the 1964 "getaway" Chevrolet. He was allowed to state that there were sufficient differences to compel the conclusion that the latent prints could not be those of Barker and Caudle. In his closing argument, counsel for Caudle argued that although Holbert had not been qualified as an expert, he would not have forgotten the skills which he had developed during the course of his work twelve years earlier. Therefore, he argued, Holbert's testimony should be believed.

4. The government's witness from the FBI's Toolmark Identification Unit in Washington was qualified as an expert after he had worked in that unit for one and one-half years, although he had no academic training or degrees in toolmark identification. His testimony did not indicate that he belonged to professional societies or subscribed to professional journals.

However, the court then expressly forbade counsel to argue that Holbert was an expert, and instructed the jury to "disregard the comments made about the proffered witness . . .," because the court had determined, based on all the circumstances, that Holbert was not an expert, "and you will accept it unequivocally." The court later instructed the jury that they could consider only those opinions that had been stated by an expert.

■ Of course, a trial judge has broad discretion to decide whether or not to permit a witness to testify as an expert. His ruling may not be disturbed unless it is clearly erroneous. *Lee Shops, Inc. v. Schatten-Cypress Co.*, 350 F.2d 12 (6th Cir. 1965), *cert. denied,* 382 U.S. 980, 86 S.Ct. 552, 15 L.Ed.2d 470 (1966). Nevertheless, if the district court applies the incorrect legal standard when it makes that determination, its judgment must be reversed. *Miley v. Delta Marine Drilling Co.,* 473 F.2d 856, 858 (5th Cir.), *cert. denied,* 414 U.S. 871, 94 S.Ct. 93, 38 L.Ed.2d 89 (1973).

At common law, expert testimony was admissible only when the factual issue was one which jurors with ordinary experience and training could not determine without technical assistance. *McKee v. Aetna Life Ins. Co.,* 423 F.2d 623 (6th Cir. 1970); *Duff v. Page,* 249 F.2d 137 (9th Cir. 1957). But the Federal Rules of Evidence have adopted the modern view that expert opinion should be admitted whenever it "will assist the trier of fact to understand the evidence or to determine a fact in issue . . . ." Rule 702.

■ According to the Federal Rules of Evidence,[5] a proposed expert witness "should not be required to satisfy an overly narrow test of his own qualifications." *Gardner v. General Motors Corp.,* 507 F.2d 525, 528 (10th Cir. 1974); Notes of the Advisory Committee on Rules. An expert need not have certificates of training, nor memberships in professional organizations. *Tank v. Commissioner,* 270 F.2d 477, 478 (6th Cir. 1959). Nor need he be, as the trial court apparently required, an outstanding practitioner in the field in which he professes expertise. Comparisons between his professional stature and the stature of witnesses for an opposing party may be made by the jury, if it becomes necessary to decide which of two conflicting opinions to believe. But the only question for the trial judge who must decide whether or not to allow the jury to consider a proffered expert's opinions is, "whether his knowledge of the subject matter is such that his opinion will most likely assist the trier of fact in arriving at the truth." *Holmgren v. Massey-Ferguson, Inc.,* 516 F.2d 856 (8th Cir. 1975).

Because the trial court applied the wrong standard when it refused to admit Holbert's expert opinion testimony, its decision was error. And because the contrary testimony of the prosecution expert, that all three defendants' fingerprints were on the rear view mirror, was an important factor linking the defendants to the "getaway" Chevrolet, we conclude that the error was not harmless.

### Prejudicial Arguments of the Prosecutor

Defendants have objected to several remarks by the prosecutor and a prosecution witness. Because only two of those comments appear to have been deliberately made, we limit our discussion to them.

■ We observe first that a prosecutor must strive to achieve two objectives. On the one hand, he is charged with enforcing the laws of the United States against persons who violate it; on the other hand, he is obliged to ensure that justice is done for an

---

5. Because we decide that the trial court misstated the applicable standard established by the Federal Rules of Evidence, it is unnecessary to decide whether the defendants' rights under the Compulsory Process Clause were also violated. We note, however, that the Compulsory Process Clause may often provide further support to the right of a criminal defendant to present evidence to support his defense. See *Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); Westen, *The Compulsory Process Clause,* 73 Mich.L.Rev. 71, 149–59 (1974).

accused. He is required to prosecute vigorously. Nevertheless, although

he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935).

▐ We believe that the prosecutor failed to comply with this obligation when he made the following remarks:

Mr. Barker's attorney admits that these defendants are not desirable people, that they're undesirable people. Now, I submit to you that desirable people don't rob banks; undesirable people do rob banks, and they admit that they're undesirable. Because they're undesirable doesn't mean they robbed this bank, but you should consider that also along with all this other evidence.

Barker's attorney had argued in summation that the police charged the defendants because they were "undesirables to law enforcement agencies," and not because they were guilty of the offenses charged.

▐ As a general rule, the prosecution may not rely upon the defendants' bad character to prove guilt unless the defense has sought to exculpate them by proof of good character. *Michelson v. United States,* 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948). The record does not indicate that defendants had sought to prove their good character. Even if they had, "that character or disposition offered, whether for or against the [defendant], must involve the *specific trait* related to the act charged." 1 Wigmore, Evidence § 58, at 458 (3d ed. 1940) (emphasis added). We do not believe that such a broad generality as "undesirables" is sufficiently probative of whether defendants committed the particular offense charged to permit reliance upon it.

Defendants have also objected to the following argument:

I submit to you that if you can't take this evidence and find these defendants guilty on this evidence that we might as well open all the banks and say, "Come on and get the money, boys, because we'll never be able to convict them."

▐ A prosecutor is permitted a certain degree of latitude in summation. He may urge the jury to convict a defendant if they believe that the evidence shows his guilt beyond a reasonable doubt. *United States v. Hoffa,* 349 F.2d 20, 51 (6th Cir. 1965), *aff'd,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). We have also permitted some reference, when accompanied immediately by a limiting instruction by the trial judge, to the community need to convict people who are guilty of crimes such as the one charged. *United States v. Alloway,* 397 F.2d 105, 113 (6th Cir. 1968). See also *United States v. Shirley,* 435 F.2d 1076, 1079 (7th Cir. 1970) (reference to the increasing number of car thefts). However, it is beyond the bounds of propriety for a prosecutor to suggest that unless this defendant is convicted it will be impossible to maintain "law and order" in the jurors' community. *Brown v. United States,* 125 U.S.App.D.C. 220, 370 F.2d 242, 246 (1966). See also *United States v. Wiley,* 534 F.2d 659, 665 (6th Cir. 1976) ("if this man goes free you have chalked up one point for the criminal").

### Newspaper Article Given to the Jury

▐ Defendants assert that the jurors were permitted to read a newspaper article, describing the robbery, which had been introduced into evidence. Defendants' motion for a mistrial, which was not made until a few hours after the article had been given to the jury, was denied. Nevertheless, the trial judge instructed the jury that if they had read the article, they must not consider the facts reported therein.

The newspaper was found in Caudle's room three weeks after the date of publication. That fact was relevant only insofar as the jury could infer that Caudle kept it because it was a story about his own activities. Nevertheless, the headline and contents of the article, except for the fact that

they were about the robbery, were not legally competent. We assume that, on retrial, the newspaper will not be given to the jury unless there is a controversy about whether or not the article is in fact about the robbery.

### CONCLUSION

For the foregoing reasons, the judgment of conviction of the three defendants is REVERSED, and the case is remanded to the district court for proceedings not inconsistent with this opinion.

PHILLIPS, Chief Judge (concurring in the result).

I agree that the convictions should be reversed and the case remanded for a new trial. Accordingly, I concur in the result.