991 F.2d 796
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Brian CASHIN (91-2303), Barry Cashin (91-2329), Defendants-Appellants.
 Nos. 91-2303, 91-2329.
 United States Court of Appeals, Sixth Circuit.
 April 9, 1993.
 
 Before JONES and GUY, Circuit Judges, and LIVELY, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Defendants, Barry Cashin and Brian Cashin, appeal their convictions for witness tampering and for conspiracy to engage in witness tampering. The Cashins both allege that the district court abused its discretion in denying their motions for a new trial, and that the court erred in admitting into evidence portions of a conversation between them that was overheard by a government witness. In addition, Barry Cashin asserts that the district court abused its discretion in refusing to subpoena all of the witnesses the defense requested to have testify at trial, and that the court violated his constitutional right against self-incrimination in sentencing him to consecutive prison terms. Brian Cashin also claims that the district court committed reversible error by admitting statements made by a co-conspirator that were not in furtherance of the conspiracy, that he was denied a fair trial, and that the district court improperly calculated his offense level pursuant to the federal sentencing guidelines. We affirm the decision of the district court.
 
 I.
 
 2
 In May of 1990, a grand jury indicted Barry Cashin for engaging in a conspiracy to distribute marijuana, possession of marijuana with intent to distribute, simple possession of LSD, and for use of a firearm in relation to a drug offense.
 
 
 3
 During November of 1990, while incarcerated in Bay County, Michigan, on these charges, Barry devised a plan to intimidate certain individuals whom he believed would testify against him at trial regarding his participation in the marijuana distribution conspiracy. He approached his cellmate, Steven Zavorski, and asked him to hire someone to "go after" these potential witnesses. He obtained Zavorski's address at Jackson State Prison, where Zavorski was being transferred, so that Brian Cashin, Barry's brother, could send him payment for his "services." Zavorski subsequently contacted FBI Agent David Welker about the scheme and agreed to cooperate with federal authorities. Additionally, Barry asked another fellow inmate to arrange the removal of certain valuables from his residence in Midland, Michigan, to avoid their forfeiture. Some of these items were to be used to provide funds to advance Zavorski's efforts.
 
 
 4
 Not realizing that Zavorski was now a cooperating informant, Brian paid Zavorski $450 for locating the witnesses sought by his brother and for hiring an "enforcer." This payment was made in the form of money orders sent to Zavorski in jail. He also personally paid $1,000 to the individual Zavorski ostensibly had hired to intimidate the witnesses, although that person was in fact Officer Michael Winters of the Michigan State Police. According to Zavorski, Brian was also to pay Zavorski's contact for purchasing dynamite, if necessary, for the purpose of killing FBI Agent Albert DiBrito, as requested by Barry.
 
 
 5
 On December 10, 1990, Barry Cashin pled guilty to the marijuana conspiracy charge pursuant to a plea agreement with the government. Two days later, Barry and Brian Cashin were each indicted on one count of conspiracy to engage in witness tampering (18 U.S.C. § 371 and 18 U.S.C. § 1512(b)) and one count of witness tampering and aiding and abetting (18 U.S.C. § 1512(b) and 18 U.S.C. § 2). Barry was also indicted on one count of solicitation to commit a crime of violence (18 U.S.C. § 373). On March 28, 1991, the Cashins were found guilty of the conspiracy and witness tampering violations. A mistrial was declared in regard to the solicitation charge against Barry after the jury deadlocked.
 
 II.
 
 6
 Both Barry and Brian contend that the district court abused its discretion in denying their motions for a new trial. The Cashins based their motions, in part, on the affidavits of Brian's wife, Deborah, which stated that she had contacted a juror in the case, Patricia McNally, by telephone the day after the verdict was rendered and had learned that another juror, Patricia White, had told McNally at some point during the trial that she knew Barry Cashin to be a "big time drug dealer in Midland for 15 years." (App. 63.) White had apparently indicated during voir dire that she was not "acquainted" with either the Cashins or the particular facts of the case. (App. 326.) In a second affidavit given five days later, Deborah Cashin asserted that McNally also told her that "most jurors thought the Government's key witness, Steve Zavorski, was a liar but since Barry Cashin was a 'big time drug dealer' he must be a worse individual and, therefore, they chose not to believe Barry Cashin." (App. 31.) She also stated that McNally informed her that the jury reached a guilty verdict on the witness tampering count before McNally had even arrived to commence deliberations and, as a result, the jury verdict did not reflect her views.[1] Additionally, Deborah Cashin's affidavits contained allegations that trial delays resulted in members of the jury failing to recall critical evidence and that the trial judge's conduct conveyed to the jury the impression that Brian was guilty.
 
 
 7
 At a hearing held on the Cashins' new trial motions, they sought to subpoena McNally and White to answer questions related to Deborah Cashin's affidavits. The district court concluded, however, that the affidavits did not demonstrate that the jury had been exposed to "extraneous prejudicial information," as defined under Rule 606(b) of the Federal Rules of Evidence. As a result, the court refused to permit McNally and White to be subpoenaed to testify at the hearing. It found that, even assuming, arguendo, the allegation concerning White's knowledge was true, the location of Barry's house and his history of drug dealing were both established at trial. Consequently, the court concluded that the Cashins were not prejudiced such that a new trial was warranted.
 
 
 8
 Rule 606(b) of the Federal Rules of Evidence (Inquiry into validity of verdict or indictment) provides:
 
 
 9
 Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.
 
 
 10
 There are a number of substantial policy considerations supporting the exclusion of juror evidence from post-trial proceedings, including the promotion of open deliberation, the stability and finality of verdicts, and the protection of jurors against annoyance and embarrassment. See Advisory Committee Notes to Fed.R.Evid. 606. As the Supreme Court explained in McDonald v. Pless, 238 U.S. 264 (1915):
 
 
 11
 [L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation--to the destruction of all frankness and freedom of discussion and conference.
 
 
 12
 Id. at 267-68. See also Tanner v. United States, 483 U.S. 107 (1987).
 
 
 13
 Accordingly, neither McNally nor White nor any of the other members of jury was free to give evidence in the hearing on the Cashins' motions for a new trial concerning the manner in which the jury reached its verdict or any feature of the deliberative process. Rule 606(b) excludes evidence related to "internal" influences upon the workings of a jury on competency grounds. This proscription was properly extended by the district court to testimony related to most of the allegations contained in Deborah Cashin's affidavits, including the jurors' reactions to trial delays, their beliefs about the trial judge's alleged biases, their recollection of the evidence, and the means by which they arrived at a guilty verdict on the witness tampering charge.
 
 
 14
 Rule 606(b) does provide a narrow exception for juror testimony related to "extraneous prejudicial information" or "outside influences." Fed.R.Evid. 606(b). The Cashins do not contend that any member of the jury was subject to threats, coercion, or other "influences" emanating from outside the jury. Arguably, however, knowledge on the part of White that Barry Cashin "was a big time drug dealer" could be considered "extraneous prejudicial information" if White failed to disclose such knowledge during voir dire. The district court analyzed White's alleged awareness of Barry's activities in such a fashion. This was an incorrect reading of Rule 606(b). Where there is an indication that a juror
 
 
 15
 had preconceived notions of liability or guilt or personal knowledge about the fact in issue, the statements may be admissible not because they are not prohibited by Rule 606(b), but as tending to prove that the juror lied on voir dire, a separate question from that of impeachment of verdicts.
 
 
 16
 Brofford v. Marshall, 751 F.2d 845, 853 (6th Cir.1985) (quoting 3 Weinstein's Evidence p 606, at 606-33). It would have been within the discretion of the district court to subpoena White to have her testify regarding whether she deliberately or inadvertently misled counsel during voir dire. However, pursuant to Rule 606(b), neither White nor McNally could have been questioned regarding the impact that any undisclosed knowledge on White's part had on the jury's deliberations. See Brofford, 751 F.2d at 853.
 
 
 17
 A remand is not necessary in light of the district court's finding that White's alleged knowledge of Barry's history of drug dealing, if indeed she possessed such knowledge, was not prejudicial. The court pointed out that extensive evidence was introduced at trial related to Barry's drug-related activities and his residence in Midland.[2] It noted that none of this information pertained directly to Brian. With regard to Barry, as the jury acquitted him of solicitation to commit a crime of violence, the court concluded that it had not been "swept away by the current tide of drug war analogies and ratcheting penalties emanating from Washington and Lansing and elsewhere" in evaluating the evidence against him. (App. 415). We agree and hold that defendants' new trial motions were properly denied to the extent they were based on information contained in Deborah Cashin's affidavits.
 
 
 18
 In their new trial motions, the Cashins also alleged that they learned subsequent to trial that a government witness, Scott Poole, had received $1,000 from FBI Agent DiBrito following the conclusion of the trial. They asserted that the failure of Poole to disclose his alleged "expectation" of future payment denied the Cashins the ability to impugn Poole's credibility, thereby depriving them of a fair trial.
 
 
 19
 At the hearing on the Cashins' motions, the government proffered a memorandum written by Agent DiBrito approximately three weeks after the conclusion of defendants' trial. This memorandum confirmed that Poole was "never promised money, nor was it implied, for services rendered[.]" (App. 78). However, DiBrito suggested that a payment of $1,000 was appropriate as an "award" versus payment for services." (Id.). Additionally, Marilyn Rosebush, the administrator of the Bay County jail, testified that Poole received the money on April 30, 1991, a month after the Cashins' trial. Based on this evidence, the district court found that the first suggestion of payment to Poole was made in DiBrito's memorandum. It also concluded that, at best, any information surrounding the payment was impeachment evidence which would not have resulted in the Cashins' acquittal.
 
 
 20
 We agree with the district court that, even if the Cashins established that Poole had been promised a reward before trial, such "newly-discovered evidence" would constitute nothing more than impeachment evidence and would not likely produce an acquittal upon retrial. See United States v. Barlow, 693 F.2d 954, 966 (6th Cir.1982), cert. denied, 461 U.S. 945 (1983). Accordingly, the district court did not err in denying the Cashins' motions for a new trial to the extent that they were based on information related to Poole. As a result, their contention is without merit.
 
 III.
 
 21
 The Cashins next contend that the district court erred in admitting into evidence portions of a conversation between them that was overheard by government witness Steven Zavorski during the course of the trial.
 
 
 22
 During a trial recess on March 14, 1991, Zavorski was taken to one of two adjoining holding cells in the court building. He was told that the Cashins would be brought up shortly and told not to initiate a conversation with them. While the Cashins were in the adjoining cell, Zavorski heard Brian tell Barry that he was "worried. He said: What if they can prove I know what the money was for." (App. 292). Apparently, Brian was concerned that the government would be able to demonstrate that he was fully aware that the payment he had made to Officer Winters was to be used to promote the witness tampering scheme. According to Zavorski, Barry replied that "[T]hey won't be able to prove it as long as you stick to the story that the money was for a private investigator." (App. 292.)
 
 
 23
 When informed about the government's intent to use Zavorski's evidence, the district court held a hearing outside the presence of the jury to ascertain the circumstances under which Zavorski came to overhear the Cashins' statements. The evidence adduced at the hearing confirmed that Zavorski remained out of sight and did not announce his presence to the Cashins, and that they were not informed that Zavorski had been placed in the adjoining cell. The court considered and rejected the Cashins' arguments that the statements should be suppressed as violative of their Fourth Amendment privacy rights and their Sixth Amendment right to counsel. Brian Cashin presently reasserts his argument based on the Sixth Amendment; Barry Cashin does not. Neither defendant claims a Fourth Amendment violation in the instant appeal.
 
 
 24
 The Cashins also raised objections to Zavorski's testimony while he was on the stand. They argued that the statements attributed to them were hearsay and were not admissible as co-conspirator statements because they were made outside the scope of any conspiracy. See Fed.R.Evid. 801(d)(2)(E). Their objections were overruled and the statements were admitted.
 
 
 25
 We first consider Brian's Sixth Amendment argument. He contends that, in light of Massiah v. United States, 377 U.S. 201 (1964), and United States v. Henry, 447 U.S. 264 (1986), the government deliberately and improperly elicited the statements at issue. He suggests that, by placing Zavorski in a cell next to him and his brother surreptitiously, the government created a situation in which the Cashins would be likely to make incriminating statements. Such a state of affairs, he asserts, was unconstitutional.
 
 
 26
 In Kuhlmann v. Wilson, 477 U.S. 436 (1986), the Supreme Court observed that "Henry left open the question whether the Sixth Amendment forbids admission in evidence of an accused's statements to a jailhouse informant who was 'placed in close proximity but [made] no effort to stimulate conversations about the crime charged.' " Id. at 456 (quoting Henry, 447 U.S. at 271 n. 9). The Court had again reserved this question in Maine v. Moulton, 474 U.S. 159 (1985), cited by Brian Cashin in support of his argument.
 
 
 27
 In Kuhlmann, the Court found that the primary concern of the Massiah-Henry line of decisions "is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation." 477 U.S. at 459. Where an informant--either through prior arrangement or voluntarily--merely happens to overhear incriminating remarks, the informant can hardly be considered to be engaging in " 'the functional equivalent of interrogation.' " Kuhlmann, 477 U.S. at 459 (quoting Henry, 447 U.S. at 277 (Powell, J. concurring)). In such circumstances, the government has not educed information from an accused after the right to counsel has attached. At most, the government has taken advantage of useful evidence that was freely, if artlessly, given.
 
 
 28
 Hence, in order to make out a Sixth Amendment violation related to Zavorski's testimony, Brian must demonstrate that "the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." Kuhlmann, 477 U.S. at 459. This he is unable to do. It is uncontroverted that the Cashins were entirely unaware of Zavorski's presence and did not engage in conversation with him. Zavorski did not initiate any contact with the Cashins whatsoever. While the government may have hoped that Zavorski would overhear and report any incriminating remarks made by the Cashins, his silent presence in the adjoining cell did not elicit any such remarks. We therefore reject Brian's argument.
 
 
 29
 As for the incriminating statements themselves, we are convinced that they did not constitute hearsay. Rule 801(c) of the Federal Rules of Evidence defines "hearsay" to be "a statement ... offered in evidence to prove the truth of the matter asserted." A "statement" is defined as "(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." Fed.R.Evid. 801(a). When these definitions are applied to the statements at issue, it is clear that the hearsay rule is not implicated. By introducing Brian's statement, the government was not attempting to show that he was actually "worried" that the government could prove that the payment to Officer Winters was part of a witness tampering scheme. Similarly, Barry's reply was not offered to show that, in fact, the government "would not be able to prove" that the payment was made for such a purpose if Brian stuck to his story. The significance of the statements was that they were made--not their content. Consequently, we find no error on the part of the district court.
 
 IV.
 
 30
 Barry Cashin contends that the district court abused its discretion in refusing to subpoena all of the witnesses the defense requested to have testify at trial.
 
 
 31
 On the first day of trial, Barry filed an ex parte motion seeking to have 15 inmates and employees from the Bay County jail subpoenaed to testify at government expense. According to defense counsel, part of Barry's defense at trial would be that Steven Zavorski coerced him through his "size, demeanor and actions" into devising the witness intimidation scheme. (App. 224). When questioned by the court about the relevance of the requested witnesses to such a line of defense, counsel stated, "What I am doing through these witnesses is attacking [Zavorski's] truthfulness and credibility." (App. 228). The court determined that it was not necessary to subpoena 15 witnesses to testify to the same general conclusory opinion about Zavorski's character and credibility. It allowed the defense to call two witnesses whom counsel indicated would offer testimony specifically related to allegedly inconsistent statements made by Zavorski. It also allowed two additional witnesses to further support Barry's claim that he was coerced by Zavorski. Ultimately, the court permitted him to call six of his requested witnesses--five fellow inmates and a corrections officer.
 
 
 32
 Rule 17(b) of the Federal Rules of Criminal Procedure (Defendants Unable to Pay) provides in pertinent part:
 
 
 33
 The court shall order at any time that a subpoena be issued for service on a named witness upon an ex parte application of a defendant upon a satisfactory showing that the defendant is financially unable to pay the fees of the witness and that the presence of the witness is necessary to an adequate defense.
 
 
 34
 In making its determination of whether issuance of a subpoena is warranted, "the district court is vested with wide discretion." United States v. Moore, 917 F.2d 215, 230 (6th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 1590 (1991). We will not reverse the district court's decision "unless the exceptional circumstances of the case indicate that defendant's right to a complete, fair and adequate trial is jeopardized." Moore, 917 F.2d at 230 (quoting Terlikowski v. United States, 379 F.2d 501, 508 (8th Cir.1967), cert. denied, 399 U.S. 1008 (1968)). Accordingly, an indigent defendant must make a preliminary showing that a requested witness is "relevant, material and useful to an adequate defense." Moore, 917 F.2d at 230. We have adopted the following standard to ensure that necessary witnesses are in fact subpoenaed:
 
 
 35
 [I]f the accused avers facts which, if true, would be relevant to any issue in the case, the requests for subpoenas must be granted, unless the averments are inherently unreliable on their face or unless the Government shows, either by introducing evidence or from matters already of record, that the averments are untrue or that the request is otherwise frivolous.
 
 
 36
 United States v. Barker, 553 F.2d 1013, 1020 (6th Cir.1977) (quoting Greenwell v. United States, 317 F.2d 108, 110 (D.C.Cir.1963) (emphasis added)).
 
 
 37
 In the instant case, the defense averred that two witnesses had information pertaining to allegedly inconsistent statements on the part of Zavorski. The district court properly allowed these witnesses. With regard to the other 13 witnesses, the defense did not show that any of these witnesses could provide specific material information regarding Zavorski's behavior. From counsel's statements, the court determined that each of these individuals would likely offer evidence of "limited relevance" related to the character, demeanor, and credibility of Zavorski. (App. 392). After reviewing the record, we conclude that the district court did not abuse its discretion in refusing to allow all 15 of the requested witnesses to testify. Six witnesses were more than enough for Barry Cashin to adequately pursue his chosen line of defense. This is especially so in light of the jury's ability to assess Zavorski's credibility and demeanor on the stand. In the absence of a more detailed showing as to why the excluded witnesses were necessary, the district court could properly find that their likely testimony would be cumulative and legally irrelevant. See Fed.R.Evid. 403.
 
 V.
 
 38
 Barry Cashin also contends that the district court abused its discretion in sentencing him to consecutive terms of imprisonment.
 
 
 39
 Barry argues that the two counts on which he was convicted were based on the same conduct without the requirement of any additional or distinct proofs at trial. As a result, he claims that he suffered a deprivation of his Fifth Amendment right against double jeopardy by receiving consecutive sentences.
 
 
 40
 One of the counts Barry was convicted on alleged violations of 18 U.S.C. § 371 and § 18 U.S.C. 1512(b) (conspiracy to engage in witness tampering), while the other alleged violations of 18 U.S.C. § 2 and 18 U.S.C. § 1512(b) (witness tampering and aiding and abetting). It is elementary that, in most instances, conspiracy and the completed substantive offense are considered separate offenses for sentencing purposes. As the Supreme Court explained in Iannelli v. United States, 420 U.S. 770 (1975):
 
 
 41
 Conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act. Unlike some crimes that arise in a single transaction, the conspiracy to commit an offense and the subsequent commission of that crime normally do not merge into a single punishable act. Thus, it is well recognized that in most cases separate sentences can be imposed for the conspiracy to do an act and for the subsequent accomplishment of that end. Indeed, the Court has even held that the conspiracy can be punished more harshly than the accomplishment of its purpose.
 
 
 42
 Id. at 777-78 (citations omitted). It is simply not the case that Barry's convictions were based upon the same evidence or were the result of the same transaction. See Blockburger v. United States, 284 U.S. 299 (1932) (when same act violates two statutes, the test of whether there are separate offenses is whether each requires proof of a fact which the other does not). In order to sustain the conspiracy charge, an agreement, which was not needed to support the substantive witness tampering charge, had to have been shown. Barry's contention accordingly lacks merit.
 
 VI.
 
 43
 Brian Cashin contends that the district court erred in admitting into evidence statements by a co-conspirator that were not in furtherance of the conspiracy.
 
 
 44
 During the course of the trial, the government was permitted to introduce certain conversations between Barry Cashin and Steven Zavorski concerning the Cashins' witness intimidation scheme, Barry's attempt to arrange for the burglary of his residence, and the proposed killing of Agent DiBrito. Brian argues that this evidence was hearsay and that much of it did not fall within the exception provided in Rule 801(d)(2)(E) of the Federal Rules of Evidence, because it was not in furtherance of the charged conspiracy to engage in witness tampering. Brian was not charged with solicitation to commit violence against Agent DiBrito.
 
 
 45
 Evidence was presented at trial that the charged conspiracy was bound up with both the burglary and the plot against Agent DiBrito, although Brian was not indicted in regard to the latter. The $1,000 that Brian paid to Officer Winters, whom the Cashins believed was an "enforcer," was earmarked both for witness tampering and for explosives intended for Agent DiBrito. According to Scott Poole, Brian was to receive a receipt and the key to a warehouse where the goods taken from Barry's residence would be stored. Proceeds from these items were to be used to partially cover the cost of intimidating witnesses.
 
 
 46
 As a consequence, the district court ruled that the Barry Cashin/Zavorski conversations were "intertwined sufficiently" with the charged conspiracy to permit their introduction against Brian. (App. 282). The court was careful, however, to give a limiting instruction in regard to the conversations:
 
 
 47
 I'm just going to briefly restate to the jury what you heard in my instructions as well as in the opening comments of the attorneys that defendant Brian Cashin to your left is not charged in the final indictment which relates to Special Agent Albert DiBrito and the claim there was a plot to harm or kill him. That charge is faced by defendant Barry Cashin only.
 
 
 48
 Therefore, testimony from this witness [Zavorski] or any other witness that relates to the statements made about Special Agent DiBrito, you're going to have to separate those in your mind and consider those statements concerning DiBrito only as it relates to defendant Barry Cashin and consider the case against defendant Brian Cashin without those comments or the evidence that relates to DiBrito.
 
 
 49
 (App. 271). Furthermore, at the conclusion of the trial, the court gave an additional cautionary instruction:
 
 
 50
 Some of the evidence and a few items were admitted only to be considered by you for limited purposes, specifically here I'm referring to the testimony by Steven Zavorski that defendant Barry Cashin sought to have his home broken into and certain things stolen from it in order to avoid government seizure.
 
 
 51
 You should consider this testimony--indeed, you are restricted in considering this testimony. That's admissible only as to defendant Barry Cashin and only as to deciding whether the government has proven the charges with respect to him. You may not consider it in any way against defendant Brian Cashin.
 
 
 52
 (App. 397.)
 
 
 53
 Evidentiary rulings of a district court are reviewed under an abuse of discretion standard. United States v. Curro, 847 F.2d 325, 328 (6th Cir.), cert denied., 488 U.S. 843 (1988). The court handled the admission of the Barry Cashin/Zavorski conversations properly by making it clear to the jury that, as against Brian Cashin, they could only be used to consider his participation in the charged conspiracy. As a result, there is no question that those aspects of the conversations that were hearsay as defined by Fed.R.Evid. 801(c) were admissible under Fed.R.Evid. 801(d)(2)(E) as co-conspirator statements. We therefore reject Brian's contention.
 
 VII.
 
 54
 Brian Cashin next contends that he was denied a fair trial as a result of trial delays as well as bias on the part of the district court.
 
 
 55
 The record indicates that the jury was selected and the government made its opening statement on Monday, March 11, 1991. The trial was then continued to March 14, when the defense made its opening statement and the first witnesses were called. The trial progressed through Friday the 15th and was then continued to the following Monday, March 18. After evidence was heard through the 20th, the proceedings were delayed until March 26 because of a vacation the district judge had scheduled. The trial concluded and deliberations began on the 26th.
 
 
 56
 Brian asserts that the delay between the 20th and the 26th, in particular, severely hampered the jury's ability to remember the facts and to assess the evidence in the case. A district court's decisions on trial management are reviewed for abuse of discretion. See, e.g., United States v. Goode, 814 F.2d 1353, 1354 (9th Cir.1987); United States v. Hershenow, 680 F.2d 847, 858 (1st Cir.1982). The court has broad discretion in determining the conduct and order of trial, to be limited only when a party's rights are prejudiced. See, e.g., Brookhart v. Janis, 384 U.S. 1 (1966) (holding denial of right to cross-examine witnesses is an abuse of discretion). We are convinced that the district court did not abuse its discretion in the instant case. When the trial resumed on the 26th, the district court, while encouraging the members of the jury to recall the evidence without refreshment, informed them that
 
 
 57
 if there's anything particularly specific about evidence that you're just unable to recall, it's difficult to ask the Court Reporter to dig through her notes and to read it back to you, but if it comes right down to that perhaps it would be possible.
 
 
 58
 (App. 399). In light of such an invitation to revisit the evidence, we fail to see how Brian was prejudiced by the six-day recess.
 
 
 59
 Brian also asserts that the district court exhibited bias against him during the course of the trial. He calls our attention to a laundry list of unfavorable rulings, mostly evidentiary in nature, which allegedly demonstrate the court's bias. A trial judge "remains under a duty to conduct the trial in an orderly fashion, to insure that the issues are not obscured and to act at all times with a view toward eliciting the truth." United States v. Tilton, 714 F.2d 642, 644 (6th Cir.1983). The record, however, does not reveal that the court's rulings were made in order to influence the verdict. The court was simply carrying out its duties with regard to the admissibility of evidence and as master of the trial. Accordingly, Brian's contention is without merit.
 
 VIII.
 
 60
 Lastly, Brian Cashin contends that the district court improperly calculated his offense level pursuant to the federal sentencing guidelines.
 
 
 61
 Brian's presentence report prepared in advance of his sentencing calculated his base offense level at 30. This level was arrived at by taking Barry's adjusted offense level of 36 in his underlying drug case and subtracting 6 levels as directed by United States Sentencing Guidelines section 2X3.1 (Accessory After the Fact). Two levels were then added for obstruction of justice (U.S.S.G. § 3C1.1), as a result of the Cashins' apparent perjured testimony at trial. Based on this adjusted offense level of 32 and a criminal history category of I, the probation department calculated Brian's sentencing range at between 121 and 151 months. After Brian objected to the presentence report, the district court tentatively adopted the calculation of the probation department but awarded Brian a two-point reduction as a minor participant, yielding an offense level of 30 and a tentative guideline range of 97-121 months.
 
 
 62
 At the sentencing hearing, Brian Cashin argued successfully that Barry's two-level upward adjustment for obstruction of justice in his underlying drug case should not be used in calculating his own offense level. However, the district court found that the presence of numerous weapons at Barry's residence in close proximity to the drugs was reasonably foreseeable to Brian. The court set Brian's offense level at 28, yielding a guideline range of 78 to 97 months. He was sentenced to concurrent terms of imprisonment of 60 months for conspiracy to engage in witness tampering and 84 months for witness tampering.
 
 
 63
 Brian alleges that the two-level enhancement derived from Barry's possession of weapons and his own two-level enhancement for obstruction of justice were in error.
 
 
 64
 Section 2X3.1 of the guidelines provides that the base offense level for one who is convicted of being an accessory after the fact is "6 levels lower than the offense level for the underlying offense...." (Emphasis added). Application Note 1 to section 2X3.1 states in relevant part that:
 
 
 65
 "Underlying offense" means the offense as to which the defendant is convicted of being an accessory. Apply the base offense level plus any applicable specific offense characteristics that were known, or reasonably should have been known, by the defendant[.]
 
 
 66
 The "underlying offense" that is pertinent to Brian's sentencing is Barry's drug trafficking conviction. In accordance with the sentencing guidelines section 2D1.1(b), possession of a dangerous weapon is a specific offense characteristic of trafficking that requires a two-level increase in a defendant's base offense level. Therefore, the only issue is whether Brian knew or reasonably should have known that Barry possessed a dangerous weapon in connection with his drug-related activities. The district court found that a number of weapons were present in Barry's residence, near a safe where drugs and money were stored. As a result, the court determined that Brian had the requisite knowledge to warrant an offense level increase. "We may not disturb the factual findings that underlie the district court's sentencing decisions unless such findings are clearly erroneous." United States v. Moreno, 899 F.2d 465, 470 (6th Cir.1990) (citing United States v. Perez, 871 F.2d 45 (6th Cir.1989)). The close relationship between the Cashins that was brought out at trial leads us to conclude that the district court did not commit error.
 
 
 67
 We also find that the district court did not err in imposing a two-level enhancement for obstruction of justice. Section 3C1.1 of the guidelines provides:
 
 
 68
 If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels.
 
 
 69
 Application Note 3(b) to section 3C1.1 states clearly that such an enhancement applies to "committing, suborning, or attempting to suborn perjury."
 
 
 70
 In the instant case, Steven Zavorski testified that he overheard Brian expressing concern that the government knew the payment to Officer Winters was intended to advance the witness intimidation scheme. Zavorski also heard Barry tell Brian to "stick to his story" that he believed the payment was for a private investigator. At trial, Brian did in fact claim that he thought he was paying the $1,000 to a private investigator to locate one of the potential witnesses against his brother to get information on his "credibility." In light of Zavorski's evidence, the district court found that Brian Cashin testified untruthfully about a material fact. The court was therefore obligated by the provisions of section 3C1.1 of the guidelines to increase Brian's offense level and did so properly. United States v. Alvarez, 927 F.2d 300, 303 (6th Cir.1991).
 
 
 71
 AFFIRMED.
 
 
 
 [1]
 Interestingly, each member of the jury, including McNally, affirmed the jury's verdict when polled. (App. 405-06)
 
 
 [2]
 Indeed, Barry Cashin freely admitted that at one time he had been "a big time drug dealer." (App. 122.)